IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

J. ARON & COMPANY,

                           Plaintiff,

          - against -

DEUTSCHE BANK AG D/B/A DEUTSCHE
BANK AG NEW YORK BRANCH, AS
AGENT BANK,

                           Defendant.

                 :

Civ. No. _____

COMPLAINT

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

     Plaintiff J. Aron & Company ("J. Aron"), by its attorneys, Boies, Schiller & Flexner LLP, for its Complaint, alleges as follows:

     1.     J. Aron brings this action seeking declaratory relief and damages against Defendant Deutsche Bank AG ("Deutsche Bank"). Deutsche Bank is the agent bank pursuant to an Intercreditor Agreement governing the rights of certain secured creditors of Aleris Nevada Management, Inc. and its corporate affiliates (collectively, "Aleris"). Section 5.2(a) of the Intercreditor Agreement requires that J. Aron's consent be obtained before there is any change in the priority of liens held by J. Aron in relation to the priority of liens held by other Aleris creditors.

     2.     On February 12, 2009, Aleris filed for bankruptcy protection and has proposed Debtor-in-Possesssion ("DIP") financing, arranged by Deutsche Bank, structured in a manner that will elevate the priority of pre-existing liens held by other

Aleris creditors relative to the priority of liens held by J. Aron. J. Aron did not consent to that change despite the Intercreditor Agreement's express requirement that J. Aron's prior consent be obtained. Rather, J. Aron has informed both Aleris and Deutsche Bank that it objects to that change.

3.    In direct breach of their obligations under the Intercreditor Agreement, Aleris and Deutsche Bank have rejected J. Aron's assertion of a contractual right of prior consent, and have arranged DIP financing on terms that adversely impact J. Aron's priority of liens without its consent.

## PARTIES

4.    Plaintiff J. Aron is a general partnership with its principal place of business at 85 Broad Street, New York, New York 10004.

5.    Defendant Deutsche Bank AG is a German corporation with its principal place of business at Theodor-Heuss-Allee 70, Frankfurt, Germany 60486.

## JURISDICTION AND VENUE

6.    This Court has jurisdiction over this matter under 28 U.S.C. § 1332 and 28 U.S.C. § 2201. This is a dispute between a citizen of New York and the subject of a foreign state and the amount in controversy, exclusive of interests and costs, substantially exceeds the $75,000 jurisdictional minimum.

7.    This Court has personal jurisdiction over Deutsche Bank because Deutsche Bank has consented (in § 6.12 of the Intercreditor Agreement) to the jurisdiction of this Court and because Deutsche Bank regularly conducts business within this District and maintains an office in this District for the purpose of conducting business here, including the conduct giving rise to the claim asserted in this Complaint.

8.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(a), (c), and (d).  Deutsche Bank has contractually agreed (in § 6.12 of the Intercreditor Agreement) that venue is proper in this District.  Moreover, a substantial part of the events or omissions giving rise to the claim occurred in this District, and Defendant Deutsche Bank is an alien corporation that regularly conducts business in this District and is subject to personal jurisdiction here.

9.    An actual case or controversy has arisen between the parties.  Deutsche Bank is actively breaching its contract with J. Aron and thereby threatening injury to J. Aron.

### FACTUAL BACKGROUND

10.    Plaintiff J. Aron is a secured creditor of Aleris.

11.    Defendant Deutsche Bank has at all relevant times served as agent for certain secured creditors of Aleris whose identities are presently unknown to Plaintiff (the "Lenders"), except that Plaintiff is informed and believes that Deutsche Bank itself is also a Lender.

12.    J. Aron and Deutsche Bank, on behalf of the Lenders, are among the parties to an Amended and Restated Secured Hedging Agreement Intercreditor Agreement, dated as of December 19, 2006, and amended and restated as of November 16, 2007 (the "Intercreditor Agreement").  A true and correct copy of the Intercreditor Agreement is attached as Exhibit A to this Complaint.

13.    Among other things, Section 5.2(a) of the Intercreditor Agreement provides that any change in the priority of liens held by Secured Hedge Counterparties

(*i.e.*, J. Aron) in relation to the priority of liens held by the Lenders or any of them requires J. Aron's consent.

14.     Aleris has recently defaulted on its obligation to make payments to J. Aron and filed for bankruptcy protection.    Before Aleris's bankruptcy filing, during a telephonic meeting held on February 3, 2009, Aleris announced to J. Aron and other creditors that, with Deutsche Bank, it is arranging DIP financing for Aleris.    Deutsche Bank further discussed the DIP financing at a telephonic meeting held the next day. During that second meeting, Deutsche Bank solicited the participation of the Lenders in the DIP financing by offering, among other things, enhanced priority for their pre-existing liens over the liens held by J. Aron.

15.     J. Aron has not consented to any change in the priority of its liens in relation to the pre-existing liens of the Lenders or any of them.    Nor has either Deutsche Bank or Aleris requested J. Aron's consent to any such change.

16.     On February 4, 2009, J. Aron personnel and outside counsel met with Aleris personnel and outside counsel in New York City and notified them that, under the Intercreditor Agreement, the proposed change in relative lien priority requires J. Aron's consent and J. Aron does not consent.    Aleris denied that J. Aron has consent rights under section 5.2(a) of the Intercreditor Agreement.

17.     Later that day, outside counsel for J. Aron met with outside counsel for Deutsche Bank and notified them that, under the Intercreditor Agreement, the proposed change in relative lien priority requires J. Aron's consent and J. Aron does not consent. Counsel for Deutsche Bank responded that Deutsche Bank denies that J. Aron has consent rights under section 5.2(a) of the Intercreditor Agreement.    In a series of further

communications between February 7, 2009, and Aleris's bankruptcy filing, J. Aron's representatives repeatedly reiterated their position to Deutsche Bank's representatives.

18.    Despite J. Aron's having repeatedly given notice that their proposed course of conduct constitutes a breach of the Intercreditor Agreement, Aleris, with Deutsche Bank's active participation, has proposed DIP financing on terms that adversely impact J. Aron's priority of liens without its consent.

19.    As the proximate result of Deutsche Bank's breach of contract, J. Aron has suffered or will suffer damages in an amount to be determined at trial, but believed to be in the tens of millions of dollars.

## FIRST CAUSE OF ACTION

(Breach of Contract Against Deutsche Bank)

20.    Petitioner repeats and realleges paragraphs 1 through 19 above as though fully set forth herein.

21.    The Intercreditor Agreement constitutes a valid and binding contract between J. Aron on the one hand and Deutsche Bank on the other.

22.    J. Aron has performed all of its obligations under the Intercreditor Agreement.

23.    By its above-described actions, Deutsche Bank has breached and is continuing to breach the Intercreditor Agreement.

24.    As a proximate result of Deutsche Bank's conduct, J. Aron has suffered or will suffer monetary damages in amount to be quantified at trial.

## SECOND CAUSE OF ACTION

(For Declaratory Judgment Pursuant to 28 U.S.C. § 2201)

25.     Plaintiff repeats and realleges paragraphs 1 through 24 above as though fully set forth herein.

26.     Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, J. Aron asks the Court to declare that by its above-described actions Deutsche Bank is breaching the Intercreditor Agreement.

27.     An actual, present, and justiciable controversy has arisen between J. Aron and Deutsche Bank concerning Deutsche Bank's actions in disregard of its obligations under the Intercreditor Agreement.

## RELIEF REQUESTED

28.     Based on the foregoing, Plaintiff J. Aron respectfully requests that the Court:

    a.  Enter judgment according to the declaratory relief sought;

    b.  Award J. Aron compensatory damages in an amount to be proven at trial;

    c.  Award J. Aron pre-judgment interest and such costs and attorneys' fees as may be allowed by law; and

    d.  Grant J. Aron such other relief as it may be entitled to and as justice may require.

Dated:      February 13, 2009
            New York, New York


                      BOIES, SCHILLER & FLEXNER LLP

                By :  _____

                      Jonathan D. Schiller
                      Scott R. Wilson
                      575 Lexington Ave.
                      New York, NY  10022
                      (212) 446-2300

                      Jonathan M. Shaw
                      5301 Wisconsin Ave., NW
                      Washington, DC 20015
                      (202) 237-2727


                      Attorneys for Plaintiff J. Aron & Company

Exhibit A

EXECUTION VERSION

AMENDED AND RESTATED SECURED HEDGING AGREEMENT
INTERCREDITOR AGREEMENT

dated as of December 19, 2006
and amended and restated as of November 16, 2007

among

ALERIS NEVADA MANAGEMENT, INC.,

ALERIS INTERNATIONAL, INC.,

the other GRANTORS from time to time party hereto,

DEUTSCHE BANK AG NEW YORK BRANCH,
as Administrative Agent under the Credit Agreement,

the SECURED HEDGE COUNTERPARTIES,

from time to time party hereto,

and

DEUTSCHE BANK AG NEW YORK BRANCH,
as Collateral Agent

[[2719521]]

# TABLE OF CONTENTS

Page

ARTICLE 1.     DEFINITIONS; PRINCIPLES OF CONSTRUCTION ................................... 3
    SECTION 1.1   Defined Terms ................................................................... 3
    SECTION 1.2   Rules of Interpretation ....................................................... 6

ARTICLE 2.     COLLATERAL ................................................................................ 7
    SECTION 2.1   Notice to the Collateral Agent ............................................ 7
    SECTION 2.2   Collateral Shared Equally and Ratably ................................ 7

ARTICLE 3.     OBLIGATIONS AND POWERS OF COLLATERAL AGENT ..................... 7
    SECTION 3.1   The Collateral Agent and the Other Secured Creditors ............ 7
    SECTION 3.2   Application of Proceeds ...................................................... 7
    SECTION 3.3   Joinder Agreements; Intercreditor Agreements ....................... 7

ARTICLE 4.     RESIGNATION OF THE COLLATERAL AGENT .......................... 8
    SECTION 4.1   Resignation of Collateral Agent ........................................... 8

ARTICLE 5.     SPECIAL PROVISIONS ................................................................ 8
    SECTION 5.1   Calculation of Obligations under Secured Hedging Agreements ............. 8
    SECTION 5.2   Limitations on Rights of Holders of Secured Hedging Obligations ......... 8
    SECTION 5.3   When Discharge of Credit Document Obligations Deemed to Not
                  Have Occurred ................................................................... 9

ARTICLE 6.     MISCELLANEOUS PROVISIONS ................................................ 10
    SECTION 6.1   Amendment. .................................................................. 10
    SECTION 6.2   Successors and Assigns ................................................... 10
    SECTION 6.3   Delay and Waiver ........................................................... 11
    SECTION 6.4   Notices .......................................................................... 11
    SECTION 6.5   Notice Following Discharge of Obligations; Termination ............... 12
    SECTION 6.6   Entire Agreement ............................................................ 12
    SECTION 6.7   Payment of Expenses and Taxes; Indemnification ................... 12
    SECTION 6.8   Severability .................................................................... 12
    SECTION 6.9   Headings ....................................................................... 13
    SECTION 6.10  Obligations Secured ........................................................ 13
    SECTION 6.11  Governing Law ............................................................... 13
    SECTION 6.12  Consent to Jurisdiction; Waivers ....................................... 13
    SECTION 6.13  Waiver of Jury Trial ........................................................ 13
    SECTION 6.14  Counterparts ................................................................. 13
    SECTION 6.15  Effectiveness .................................................................. 14
    SECTION 6.16  Additional Grantors ......................................................... 14
    SECTION 6.17  Insolvency ...................................................................... 14

EXHIBIT A – Form of Joinder Agreement

[[2719521]]

This AMENDED AND RESTATED SECURED HEDGING AGREEMENT INTERCREDITOR AGREEMENT (this "Agreement") is dated as of December 19, 2006 and amended and restated as of November 16, 2007 and is by and among ALERIS NEVADA MANAGEMENT, INC., a Nevada corporation (the "Company"), ALERIS INTERNATIONAL, INC., a Delaware corporation (the "Parent"), the other Grantors from time to time party hereto (collectively, the "Grantors"), DEUTSCHE BANK AG NEW YORK BRANCH, as Administrative Agent (as defined below), each SECURED HEDGE COUNTERPARTY party hereto from time to time (each a "Secured Hedge Counterparty") and DEUTSCHE BANK AG NEW YORK BRANCH, as collateral agent (in such capacity and together with its successors in such capacity, the "Collateral Agent").

RECITALS

WHEREAS, the Parent has entered into an Amended and Restated Term Loan Agreement, dated as of December 19, 2006 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), with Aurora Acquisition Merger Sub, Inc. (the "Merger Sub"), certain Subsidiaries of the Parent, the lending institutions from time to time party thereto (the "Lenders"), Deutsche Bank AG New York Branch, as administrative agent for the Lenders (in such capacity and together with its successors in such capacity, the "Administrative Agent"), pursuant to which the Lenders have severally agreed to make loans to the Parent and the German Borrower (as defined in the Credit Agreement);

WHEREAS, J. Aron & Company (the "GS Counterparty") is party to an ISDA Master Agreement, dated as of the date hereof (together with each Confirmation (as defined therein) and each annex, exhibit and schedule referred to therein and/or attached thereto, and each as amended from time to time, by and between the Company and the GS Counterparty (the "GS Commodity Hedging Agreement"), and the Company, the Parent and the GS Counterparty desire that such GS Commodity Hedging Agreement constitutes a Secured Term Hedging Agreement under, and as defined in, the ABL/TL Intercreditor Agreement (as defined below);

WHEREAS, the Company is a Wholly-Owned Domestic Subsidiary, a Restricted Subsidiary and not an Immaterial Subsidiary (as such terms are defined in the Credit Agreement) of Parent and has executed a Joinder Agreement (as defined in the Credit Agreement);

WHEREAS, each Secured Hedge Counterparty party hereto from time to time may enter into one or more additional Secured Term Hedging Agreements with one or more Grantors;

WHEREAS, pursuant to Section 12 of the Credit Agreement, the Parent has agreed to guarantee to the Administrative Agent, for the ratable benefit of the Guaranteed Creditors (as defined therein), the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise) of the Relevant Term Loan Guaranteed Obligations (as defined therein) (Sections 11 and 12 of the Credit Agreement and the related definitions used in such Sections are collectively referred to as the "Borrower Guaranty");

WHEREAS, pursuant to the Amended and Restated U.S. Subsidiaries Guaranty, dated as of December 19, 2006 (as amended, supplemented and modified from time to time, the "Subsidiary Guaranty" and, together with the Borrower Guaranty, the "Guarantees"), each of the

[[2719521]]

Grantors (other than the Parent) has agreed to guarantee to the Administrative Agent, for the ratable benefit of the Secured Parties (as defined therein), the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise) of the Guaranteed Obligations (as defined therein);

WHEREAS, the Company, the Parent and the other Grantors intend to secure the Obligations of the Company, the Parent and the other Grantors under the Credit Agreement, the Guarantees and the Secured Term Hedging Agreements on a first priority basis with Liens on the Term Priority Collateral (as defined in the ABL/TL Intercreditor Agreement (as defined below)) and on a second priority basis with the Liens on the ABL Priority Collateral (as defined in the ABL/TL Intercreditor Agreement) pursuant to the Amended and Restated Security Agreement dated as of August 1, 2006 and amended and restated as of December 19, 2006 among the Parent, the other Grantors, the Administrative Agent and the Collateral Agent (as amended, supplemented or otherwise modified, the "Security Agreement") and the other Security Documents (as defined in the Credit Agreement);

WHEREAS, the Parent has entered into an Amended and Restated Credit Agreement dated as of December 19, 2006 (as amended, modified or otherwise supplemented, the "ABL Credit Agreement") with Merger Sub, certain subsidiaries of the Parent, the lending institutions from time to time party thereto, Deutsche Bank AG New York Branch (in such capacity, together with its successors in such capacity, the "ABL Administrative Agent") and the other agents party thereto providing the making of loans to, and the issuance of letters of credit for the account of, the Parent and certain of its subsidiaries;

WHEREAS, the Parent and the other Grantors intend to secure their obligations under the ABL Credit Agreement and the other ABL Obligations (as defined in the ABL/TL Intercreditor Agreement) on a first priority basis with Liens on the ABL Priority Collateral and on a second priority basis with Liens on the Term Priority Collateral;

WHEREAS, the Parent, certain of its Subsidiaries (including the other Grantors), the Administrative Agent, the Collateral Agent, the ABL Administrative Agent, and Deutsche Bank AG New York Branch, as collateral agent for the ABL Secured Parties (as defined in the ABL/TL Intercreditor Agreement) (in such capacity, together with its successors in such capacity, the "ABL Collateral Agent") have entered into the Amended and Restated Intercreditor Agreement dated as of August 1, 2006 and amended and restated as of December 19, 2006 (as amended, supplemented or otherwise modified from time to time, the "ABL/TL Intercreditor Agreement") which sets forth the agreements of the parties with respect to the priority, exercise of rights and other matters relating to the ABL Priority Collateral and the Term Priority Collateral;

AGREEMENT

In consideration of the premises and the mutual agreements herein set forth, the receipt and sufficiency of which are hereby acknowledged, the parties to this Agreement hereby agree as follows:

[[2719521]]

# ARTICLE 1.  DEFINITIONS; PRINCIPLES OF CONSTRUCTION

SECTION 1.1    <u>Defined Terms</u>.    Capitalized terms used but not defined in this Agreement will have the meanings assigned to them in the Credit Agreement.  The following terms will have the following meanings:

"<u>ABL Administrative Agent</u>" has the meaning set forth in the recitals.

"<u>ABL Collateral Agent</u>" has the meaning set forth in the recitals.

"<u>ABL Credit Agreement</u>" has the meaning set forth in the recitals.

"<u>ABL/TL Intercreditor Agreement</u>" has the meaning set forth in the recitals.

"<u>Additional Intercreditor Agreement</u>" has the meaning provided in Section 3.3.

"<u>Administrative Agent</u>" has the meaning set forth in the recitals.

"<u>Agreement</u>" has the meaning set forth in the preamble.

"<u>Average Exposure</u>" means, as of any date, the average of all of the One-Way Exposures as of such date.

"<u>Borrower Guaranty</u>" has the meaning set forth in the recitals.

"<u>Collateral</u>" means all properties and assets of the Company, the Parent and the other Grantors, now owned or hereafter acquired in which Liens have been granted to the Collateral Agent to secure the Secured Obligations; <u>provided</u>, <u>however</u>, that for the avoidance of doubt, the Collateral shall not include (1) any rights of the any Secured Hedge Counterparty under any Secured Term Hedging Agreement or any performance assurance therefor in the form of cash or a letter of credit in favor of such Secured Hedge Counterparty or (2) any property or assets of any Subsidiary of the Parent which is not a Grantor.

"<u>Collateral Agent</u>" has the meaning set forth in the preamble.

"<u>Company</u>" has the meaning set forth in the preamble.

"<u>Credit Agreement</u>" has the meaning set forth in the recitals.

"<u>Credit Document Obligations</u>" has the meaning set forth in the Security Agreement.

"<u>Discharge of Credit Document Obligations</u>" shall mean, except to the extent otherwise provided in Section 5.3 of this Agreement, the occurrence of all of the following:

(1)    termination or expiration of all commitments to extend credit that would constitute Credit Document Obligations;

(2)    payment in full in cash of the principal of and interest and premium (if any) on all Credit Document Obligations; and

(3)    payment in full in cash of all other Credit Document Obligations that are outstanding and unpaid at the time the termination, expiration or discharge set forth in clauses (1) through (2) above have occurred (other than any obligations for taxes, costs, indemnifications, reimbursements, damages and other contingent liabilities in respect of which no claim or demand for payment has been made at such time).

"Discharge of Secured Hedging Obligations" means in respect of any Secured Term Hedging Agreement, the payment in full, discharge or other termination of all Secured Hedging Obligations under such Secured Term Hedging Agreement or the delivery of cash collateral, letters of credit or other substitute collateral for the Secured Hedging Obligations.

"Documents" means, collectively, the Credit Documents, the Secured Term Hedging Agreements and the Security Documents (other than any Security Documents that do not secure Secured Obligations).

"equally and ratably" means, in reference to sharing of Liens or proceeds thereof as between holders of Secured Obligations that such Liens or proceeds are shared as set forth in the Security Agreement (including Section 7.4 thereof).

"Expected Exposure" means, as of any date, the greatest Average Exposure as of such date.

"Grantors" means the Company, the Parent and the guarantors under the Security Agreement and any other Person (if any) that at any time provides collateral security for any Secured Obligations.

"GS Counterparty" has the meaning set forth in the recitals.

"GS Commodity Hedging Agreement" has the meaning set forth in the recitals.

"Guarantees" has the meaning set forth in the recitals.

"Indebtedness" has the meaning specified in the ABL/TL Intercreditor Agreement.

"Insolvency or Liquidation Proceeding" means:

(1)    any case commenced by or against the Company or any other Grantor under Title 11, U.S. Code or any similar federal or state law for the relief of debtors, any other proceeding for the reorganization, recapitalization or adjustment or marshalling of the assets or liabilities of the Company or any other Grantor, any receivership or assignment for the benefit of creditors relating to the Company or any other Grantor or any similar case or proceeding relative to the Company or any other Grantor or its creditors, as such, in each case whether or not voluntary;

(2)    any liquidation, dissolution, marshalling of assets or liabilities or other winding up of or relating to the Company or any other Grantor, in each case whether or not voluntary and whether or not involving bankruptcy or insolvency; or

(3)    any other proceeding of any type or nature in which substantially all claims of creditors of the Company or any other Grantor are determined and any payment or distribution is or may be made on account of such claims.

"Joinder Agreement" has the meaning set forth in Section 3.3.

"Lenders" has the meaning set forth in the recitals.

"Merger Sub" has the meaning set forth in the recitals.

"New Agent" has the meaning set forth in Section 5.3.

"New Credit Agreement Notice" has the meaning set forth in Section 5.3.

"One-Way Exposures" means, as of any date, with respect to any Secured Term Hedging Agreement, the greatest possible monthly exposure of the counterparty to such Secured Term Hedging Agreement that is not Aleris or any of its Affiliates, as determined in good faith by such counterparty, for each remaining month during the term of the trades entered into pursuant to such Secured Term Hedging Agreement.

"Other Obligations" has the meaning set forth in the Security Agreement.

"Parent" has the meaning set forth in the preamble.

"Refinance" has the meaning provided in the ABL/TL Intercreditor Agreement.

"Representative" means:

(1)    in the case of the Credit Agreement, the Administrative Agent; or

(2)    in the case of a Secured Term Hedging Agreement, the counterparty to such Secured Term Hedging Agreement that is not the Company or any of its affiliates.

"Required Secured Creditors" has the meaning provided in the Security Agreement.

"Secured Hedge Counterparty" means GS Counterparty and any other counterparty to a Secured Term Hedging Agreement which executes a Joinder Agreement hereto.

"Secured Hedging Obligations" means all obligations (including guaranty obligations) of each Grantor under the Secured Term Hedging Agreements.

"Secured Obligations" means any principal (including reimbursement obligations with respect to letters of credit whether or not drawn), interest (including all interest accrued thereon after the commencement of any Insolvency or Liquidation Proceeding at the rate, including any applicable post-default rate, specified in the Documents, only if and to the extent that such interest is enforceable, allowable or allowed as a claim in such proceeding), premium (if any), fees, indemnifications, reimbursements, expenses, damages and other liabilities or amounts payable under the documentation governing the Credit Document Obligations and Secured Hedging Obligations.

"Secured Parties" means the holders of Secured Obligations and the Representatives.

"Security Agreement" has the meaning set forth in the recitals.

"Security Documents" means this Agreement, the Security Agreement, U.S. Pledge Agreement, Credit Document Acknowledgement and Amendment, ABL/TL Intercreditor Agreement, Mortgage, each Additional Security Document and all other security agreements, pledge agreements, collateral assignments, intercreditor agreements, mortgages, collateral agency agreements, control agreements, deeds of trust or other grants or transfers for security executed and delivered by the Company, the Parent or any other Grantor creating (or purporting to create) a Lien upon Collateral in favor of the Collateral Agent, for the benefit of the Secured Parties, in each case, as amended, modified, renewed, restated or replaced, in whole or in part, from time to time, in accordance with its terms and Section 5.1.

"Subsidiary Guaranty" has the meaning set forth in the recitals.

"UCC" means the Uniform Commercial Code as in effect in the State of New York or any other applicable jurisdiction.

SECTION 1.2    Rules of Interpretation.

(a)    All terms used in this Agreement that are defined in Article 9 of the UCC and not otherwise defined herein have the meanings assigned to them in Article 9 of the UCC.

(b)    Unless otherwise indicated, any reference to any agreement or instrument will be deemed to include a reference to that agreement or instrument as assigned, amended, supplemented, amended and restated, or otherwise modified and in effect from time to time or replaced in accordance with the terms of this Agreement.

(c)    The use in this Agreement or any of the other Security Documents of the word "include" or "including," when following any general statement, term or matter, will not be construed to limit such statement, term or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not nonlimiting language (such as "without limitation" or "but not limited to" or words of similar import) is used with reference thereto, but will be deemed to refer to all other items or matters that fall within the broadest possible scope of such general statement, term or matter.  The word "will" shall be construed to have the same meaning and effect as the word "shall."

(d)    References to "Sections," "clauses," "recitals" and the "preamble" will be to Sections, clauses, recitals and the preamble, respectively, of this Agreement unless otherwise specifically provided.  References to "Articles" will be to Articles of this Agreement unless otherwise specifically provided.  References to "Exhibits" and "Schedules" will be to Exhibits and Schedules, respectively, to this Agreement unless otherwise specifically provided.

(e)    This Agreement and the other Security Documents will be construed without regard to the identity of the party who drafted it and as though the parties participated equally in drafting it.  Consequently, each of the parties acknowledges and agrees that any rule of

construction that a document is to be construed against the drafting party will not be applicable either to this Agreement or the other Security Documents.

ARTICLE 2.    COLLATERAL

SECTION 2.1    Notice to the Collateral Agent.

The Company, the Parent and the GS Counterparty hereby notify the Collateral Agent that the GS Commodity Hedging Agreement (i) constitutes a "Secured Hedging Agreement" for purposes of the Credit Agreement and the other Credit Documents, (ii) does not constitute a "Secured Hedging Agreement" for purposes of the ABL Credit Agreement, the ABL Security Documents or any guaranties relating to the ABL Credit Agreement (as defined in the Credit Agreement) and (iii) in the case of the Parent, has been entered into, and the obligations of the Company and the Parent thereunder incurred, in compliance with the Credit Agreement.

SECTION 2.2    Collateral Shared Equally and Ratably.  The parties to this Agreement agree that the payment and satisfaction of all of the Secured Obligations will be secured equally and ratably by the Liens established in favor of the Collateral Agent for the benefit of the Secured Parties as set forth in the Security Agreement and the other Security Documents.

ARTICLE 3.    OBLIGATIONS AND POWERS OF COLLATERAL AGENT

SECTION 3.1    The Collateral Agent and the Other Secured Creditors.  The Collateral Agent will hold in accordance with the Security Agreement and the other Security Documents (and to the extent applicable, the ABL/TL Intercreditor Agreement and any Additional Intercreditor Agreements, if any) all items of the Collateral at any time received thereunder.  It is expressly understood and agreed that the obligations of the Collateral Agent as holder of the Collateral and interests therein and with respect to the disposition thereof, and otherwise under this Agreement, the Security Agreement and the other Security Documents, are only those expressly set forth in this Agreement, the Security Agreement and the other Security Documents. The Collateral Agent shall act thereunder on the terms and conditions set forth therein and in Annex M to the Security Agreement, the terms of which shall be deemed incorporated herein by reference as fully as if same were set forth herein in their entirety.

SECTION 3.2    Application of Proceeds.

(a)    The Collateral Agent will apply the proceeds of any collection, sale, foreclosure or other realization upon any Collateral in the order of application set forth in Section 7.4 of the Security Agreement.

SECTION 3.3    Joinder Agreements; Intercreditor Agreements..  The Collateral Agent is authorized by the GS Counterparty and each other party hereto to enter into one or more (x) joinder agreements with future parties to Secured Term Hedging Agreements in substantially the form of Annex A hereto (each a "Joinder Agreement") and/or (y) intercreditor agreements with future holders of other Indebtedness which pursuant to the terms of the Credit Agreement is permitted to be incurred and secured on a *pari passu* basis with the Secured Obligations (each an "Additional Intercreditor Agreement"). The Company, the Parent and the Grantors agree that they will not and they will not permit their Subsidiaries to enter into any Secured Term Hedging

Agreements unless the applicable counterparty to such Secured Term Hedging Agreement agrees to be bound by the provisions of the first sentence of Section 5.1 of this Agreement.

## ARTICLE 4.   RESIGNATION OF THE COLLATERAL AGENT

SECTION 4.1    Resignation of Collateral Agent.  (a)  The Collateral Agent may resign at the times and in the manner set forth in the Credit Agreement and the Security Agreement.

(b)    Notwithstanding the foregoing, upon the Discharge of the Credit Document Obligations, the Collateral Agent shall be entitled to (x) assign all of its rights and interests under the Security Documents to such Representative as is reasonably satisfactory to the Company as shall have been designed by the Secured Hedge Counterparties and (y) resign from all of its duties and obligations as Collateral Agent upon 15 days' prior written notice, whether or not a successor collateral agent has been appointed.

## ARTICLE 5.   SPECIAL PROVISIONS

SECTION 5.1    Calculation of Obligations under Secured Term Hedging Agreements. Notwithstanding Section 25 of the Subsidiary Guarantee, any calculation of obligations outstanding under the Secured Term Hedging Agreements and any calculation of Other Obligations, in each case, for purposes of this Agreement, the Guarantees or any other Security Document shall be, (x) if prior to the termination of such Secured Term Hedging Agreement, the maximum aggregate amount (giving effect to any netting agreements) that the Company and the other Grantors would be required to pay if such Secured Term Hedging Agreement were terminated at such time, but in no event should such amount with respect to the GS Commodity Hedging Agreement be deemed to be less than $35,000,000 or with respect to any other Secured Term Hedging Agreement, the Expected Exposure, as set forth in the applicable Joinder Agreement and (y) if after the termination of such Secured Term Hedging Agreements, the amount which is actually due and payable by the Company and the other Grantors under such Secured Term Hedging Agreement at such time and for purposes of Section 7 of the Security Agreement, the amount which is actually due and payable by the Company and the other Grantors under such Secured Term Hedging Agreement at such time.

SECTION 5.2    Limitations on Rights of Holders of Secured Hedging Obligations.

(a)    Notwithstanding anything to the contrary contained herein, in the Security Agreement or in any other Security Document, but subject to Section 5.2(b), in no event shall any holder of Secured Hedging Obligations be entitled to (x) foreclose on or initiate remedies or otherwise take any action with respect to the Collateral or under the Security Documents, (y) exercise any voting or consent rights with respect to the Collateral or under the Security Documents, including with respect to requests for releases of Liens, sales, transfers or other dispositions of Collateral or amendments to the Security Documents; provided that (1) the provisions of this Section 5.2(a) shall not apply after the Discharge of Credit Document Obligations and (2) the consent of each Secured Hedge Counterparty shall be required at all times with respect to (x) in the case of all or substantially all of the Liens, changes in the priority of such holder's Lien in relation to the priority of the Liens securing the other Secured

Obligations, (y) other changes or actions under the Borrower Guaranty or the Security Documents as to which such holder is disproportionately and adversely impacted relative to other holders of Secured Obligations or (z) the release of all or substantially all of the Collateral (other than in connection with the sale thereof whether pursuant to a foreclosure or otherwise).

(b)    Notwithstanding Section 5.2(a), at all times the holders of Secured Hedging Obligations may take any actions and exercise any and all rights that would otherwise be available to a holder of unsecured claims, including, without limitation, the commencement of Insolvency or Liquidation Proceedings against any Grantor in accordance with applicable law and the termination of any Secured Term Hedging Agreement in accordance with the terms thereof and to apply any performance assurance provided by the Grantors in the form of cash or letter of credit to the satisfaction of the Grantors' obligations thereunder.

(c)    Subject to clauses (y) and (z) of the proviso to clause (a) of this Section 5.2 and Section 5.5, the Liens on the Collateral securing the Secured Hedging Obligations will be released upon the earlier of (i) the release of the Lien thereon securing all of the Credit Document Obligations (other than any such release occurring in connection with, or in contemplation of, the Discharge of Credit Document Obligations) and (ii) the Discharge of Secured Hedging Obligations with respect to such Secured Hedging Obligations.

SECTION 5.3    When Discharge of Credit Document Obligations Deemed to Not Have Occurred.  If at any time concurrent with or after the Discharge of Credit Document Obligations, the Parent enters into any Refinance of any Credit Document Obligations or any new Indebtedness which, had it been entered into on the date of such Discharge of Credit Document Obligations would have qualified as a Refinancing of any Credit Document Obligation, then to the extent that such Refinance Indebtedness is secured by first priority Lien on the Term Priority Collateral, such Discharge of Credit Document Obligations shall automatically be deemed not to have occurred for all purpose of this Agreement (other than with respect to any actions taken as a result of the occurrence of such Discharge of Credit Document Obligations), and, from and after the date on which the New Credit Agreement Notice (as defined below) is delivered to the Collateral Agent in accordance with the next sentence, the obligation under such Refinance of the Credit Document Obligations or such other new Indebtedness as the case as may be, shall automatically be treated as Credit Document Obligations for all purpose of this Agreement, including for purpose of the Lien priorities and rights in respect of Collateral set forth herein, and the New Agent (as defined below) under such new Credit Agreement shall be a Collateral Agent for all purposes of this Agreement.  Upon receipt of a notice (the "New Credit Agreement Notice") stating that any Grantor has entered into a new Credit Agreement (which notice shall include the identity of the new senior lien agent, such agent, the "New Agent"), (a) the Collateral Agent and Secured Hedge Counterparties then party hereto shall promptly enter into such documents and agreements (including amendments or supplements to this Agreement) as any Grantor or such New Agent shall reasonably request in order to provide to the New Agent the rights contemplated hereby in each case consistent in all material respect with the terms of this Agreement, (b) the New Agent shall agree in a writing addressed to the Secured Hedge Counterparties then party hereto to be bound by the terms of this Agreement. The Collateral Agent shall, subject to the terms of the ABL/TL Intercreditor Agreement, deliver to the New Agent any Pledged Term Priority Collateral (as defined in the ABL/TL Intercreditor Agreement) held by the Collateral Agent together with any

necessary endorsements (or otherwise allow the New Agent to obtain control of such Pledged Term Priority Collateral).

SECTION 5.4    No Amendment to U.S. Borrower Guaranty Permitted. The Parent shall not amend the Borrower Guaranty in any manner that affects the rights or privileges of the GS Counterparty under the Borrower Guaranty without the consent of the GS Counterparty.

SECTION 5.5    Maintenance of U.S. Borrower Guaranty. The Parent and the Company each agree that they shall not permit the Borrower Guaranty as set forth in the Credit Agreement to be terminated unless the GS Counterparty, the Parent and the Administrative Agent enter into a new guarantee agreement containing the same terms as the Borrower Guaranty in so far as the guaranty of the Secured Hedging Obligations is concerned and such new guarantee is secured by the same Collateral as secured the Borrower Guaranty immediately prior to such termination.

SECTION 5.6    Third Party Beneficiary. The GS Counterparty is an intended third party beneficiary of the Borrower Guaranty and shall have the right to enforce the Borrower Guaranty directly against the Parent in accordance with its terms.

ARTICLE 6.   MISCELLANEOUS PROVISIONS

SECTION 6.1    Amendment.

(a)    Subject to Section 6.1(b), no amendment or supplement to the provisions of the Borrower Guaranty, any Security Document, the ABL/TL Intercreditor Agreement or any Additional Intercreditor Agreement will be effective without the approval of the Collateral Agent acting as directed by the Required Secured Creditors and, to the extent required by Section 5.2(a), the Secured Hedge Counterparties.

(b)    No amendment or supplement to this Agreement will be effective without the approval of the Collateral Agent and each Secured Hedging Counterparty; provided that the addition or release of a Secured Hedge Counterparty shall not require the consent of any other Secured Hedge Counterparty.

SECTION 6.2    Successors and Assigns.

(a)    Except as provided in Section 4.1, the Collateral Agent may not, in its capacity as such, delegate any of its duties or assign any of its rights hereunder, and any attempted delegation or assignment of any such duties or rights will be null and void.

(b)    The GS Counterparty may automatically transfer its rights and obligations hereunder or under any Security Document to a permitted assignee pursuant to Section 7 of the ISDA Master Agreement, dated as of September 11, 2007 between the Company and the GS Counterparty, provided that the assignee is or concurrently shall become bound by this Agreement.

If to the GS Counterparty:                    J. Aron & Company
                                              85 Broad Street
                                              New York, New York 10004
                                              Phone: (212) 902-8986
                                              Facsimile: (212) 344-3457
                                              Attention: Commodity Operations

and if to any other Secured Debt Representative, to such address as it may specify by written notice to the parties named above.

All notices and communications will be mailed by first class mail, certified or registered, return receipt requested, or by overnight air courier guaranteeing next day delivery, to the relevant address set forth above. Failure to mail a notice or communication to a holder of Secured Debt or any defect in it will not affect its sufficiency with respect to other holders of Secured Debt.

If a notice or communication is mailed in the manner provided above within the time prescribed, it is duly given, whether or not the addressee receives it.

SECTION 6.5    Notice Following Discharge of Obligations; Termination.

(a)    Promptly following the Discharge of Secured Hedge Obligations with respect to any Secured Hedging Obligation, the applicable Secured Hedge Counterparty will provide written notice of such discharge to the Collateral Agent.

(b)    Promptly following the Discharge of Credit Document Obligations, the Administrative Agent will provide written notice of such discharge to Representatives for each Secured Hedge Counterparty.

(c)    This Agreement shall terminate upon the Discharge of Secured Hedging Obligations with respect to all Secured Hedging Obligations.

SECTION 6.6    Entire Agreement. This Agreement states the complete agreement of the parties relating to the undertaking of the Collateral Agent set forth herein and supersedes all oral negotiations and prior writings in respect of such undertaking.

SECTION 6.7    Payment of Expenses and Taxes; Indemnification. The Grantors agree that this Agreement constitutes a Secured Debt Agreement for purposes of Article VIII of the Security Agreement.

SECTION 6.8    Severability. If any provision of this Agreement is invalid, illegal or unenforceable in any respect or in any jurisdiction, the validity, legality and enforceability of such provision in all other respects and of all remaining provisions, and of such provision in all other jurisdictions, will not in any way be affected or impaired thereby.

SECTION 6.9    Headings. Section headings herein have been inserted for convenience of reference only, are not to be considered a part of this Agreement and will in no way modify or restrict any of the terms or provisions hereof.

SECTION 6.10    Obligations Secured. All obligations of the Grantors set forth in or arising under this Agreement will be Secured Obligations and are secured by all Liens granted by the Security Documents.

SECTION 6.11    Governing Law. THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

SECTION 6.12    Consent to Jurisdiction; Waivers. Each party hereto hereby irrevocably and unconditionally:

(a)    submits for itself and its property in any legal action or proceeding relating to this Agreement and the other Security Documents to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the non-exclusive general jurisdiction of the courts of the State of New York, the courts of the United States of America for the Southern District of New York and appellate courts from any thereof;

(b)    consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c)    agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such Grantor at its address set forth in Section 6.4 or at such other address of which the Collateral Agent shall have been notified pursuant thereto;

(d)    agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law or shall limit the right to sue in any other jurisdiction; and

(e)    waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section 6.12 any special, exemplary, punitive or consequential damages.

SECTION 6.13    Waiver of Jury Trial. EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN.

SECTION 6.14    Counterparts. This Agreement may be executed in any number of counterparts (including by facsimile), each of which when so executed and delivered will be deemed an original, but all such counterparts together will constitute but one and the same instrument.

SECTION 6.15    Effectiveness.    This Agreement will become effective upon the execution of a counterpart hereof by each of the parties hereto and receipt by each party of written notification of such execution and written or telephonic authorization of delivery thereof.

SECTION 6.16    Additional Grantors.    The Company will cause each Person that becomes a Grantor or is required by any Secured Debt Agreement (as defined in the Security Agreement) to become a party to this Agreement, for all purposes of this Agreement, by causing such Person to execute and deliver to the parties hereto a Joinder Agreement, whereupon such Person will be bound by the terms hereof to the same extent as if it had executed and delivered this Agreement as of the date hereof.  The Company shall promptly provide each Representative with a copy of each Joinder Agreement executed and delivered pursuant to this Section 6.16.

SECTION 6.17    Insolvency.  This Agreement will be applicable both before and after the commencement of any Insolvency or Liquidation Proceeding by or against any Grantor.  The relative rights, as provided for in this Agreement, will continue after the commencement of any such Insolvency or Liquidation Proceeding on the same basis as prior to the date of the commencement of any such case, as provided in this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Secured Hedging Agreement Intercreditor Agreement to be executed by their respective officers or representatives as of the day and year first above written.

ALERIS NEVADA MANAGEMENT, INC.

By: _____
Title: Director

ALERIS INTERNATIONAL, INC.

By: _____
Title: Director

ALCHEM ALUMINUM, INC.

ALCHEM ALUMINUM SHELBYVILLE INC.

ALERIS, INC.

ALERIS OHIO MANAGEMENT, INC.

ALSCO HOLDINGS, INC.

ALSCO METALS CORPORATION

ALUMITECH OF CLEVELAND, INC.

ALUMITECH OF WABASH, INC.

ALUMITECH OF WEST VIRGINIA, INC.

ALUMITECH, INC.

AWT PROPERTIES, INC.

CA LEWISPORT, LLC

CI HOLDINGS, LLC

COMMONWEALTH ALUMINUM CONCAST, INC.

COMMONWEALTH ALUMINUM LEWISPORT, LLC

COMMONWEALTH ALUMINUM METALS, LLC

COMMONWEALTH ALUMINUM SALES CORPORATION

[[2719521]]

COMMONWEALTH ALUMINUM TUBE ENTERPRISES, LLC

COMMONWEALTH ALUMINUM, LLC

COMMONWEALTH FINANCING CORP.

COMMONWEALTH INDUSTRIES, INC.

ETS SCHAEFER CORPORATION

GULF REDUCTION CORPORATION

IMCO INTERNATIONAL, INC.

IMCO INVESTMENT COMPANY

IMCO RECYCLING OF CALIFORNIA, INC.

IMCO RECYCLING OF IDAHO INC.

IMCO RECYCLING OF ILLINOIS INC.

IMCO RECYCLING OF INDIANA INC.

IMCO RECYCLING OF MICHIGAN L.L.C.

IMCO RECYCLING OF OHIO INC.

IMCO RECYCLING OF UTAH INC.

IMCO RECYCLING SERVICES COMPANY

IMSAMET, INC.

ALERIS BLANKING AND RIM PRODUCTS, INC. (f/k/a/ INDIANA ALUMINUM INC.)

INTERAMERICAN ZINC, INC.

METALCHEM, INC.

MIDWEST ZINC CORPORATION

ROCK CREEK ALUMINUM, INC.

SILVER FOX HOLDING COMPANY

U.S. ZINC CORPORATION

U.S. ZINC EXPORT CORPORATION

WESTERN ZINC CORPORATION

By: _____

Title: ~~Director~~ Senior VP

[[2719521]]

ALERIS LIGHT GAUGE PRODUCTS INC.

By: _____
Title:

WABASH ALLOYS, L.L.C.

By: _____
Title:

ALERIS SPECIFICATION ALLOY
PRODUCTS CANADA COMPANY

By: _____
Title:

[[2719521]]

ALERIS ALUMINUM U.S. SALES, INC.
f/k/a CORUS ALUMINIUM CORP.

ALERIS ALUMINUM
~~HOOGOVENS ALUMINIUM EUROPE INC.~~
f/k/a HOOGOVENS ALUMINIUM EUROPE, INC.

By: _____
Title: ~~Director~~ PRESIDENT

[[271952J]]

IMCO INDIANA PARTNERSHIP L.P.
By:  IMCO International, Inc., its General
Partner

By:_____
    Title: ~~Director~~ M. UP


IMCO MANAGEMENT PARTNERSHIP, L.P.
By:  Aleris International, Inc., its General
Partner

By:_____
    Title:  Executive UP


[[2719521]]

DEUTSCHE BANK AG NEW YORK
BRANCH,
as Administrative Agent

By: _____
   Title:   **Enrique Landaeta**
            **Vice President**
By: _____
   Title:   MARGUERITE SUTTON
            DIRECTOR


DEUTSCHE BANK AG NEW YORK
BRANCH,
as Collateral Trustee

By: _____
   Title:   **Enrique Landaeta**
            **Vice President**
By: _____
   Title:   MARGUERITE SUTTON
            DIRECTOR

[[2719521]]

J. ARON & COMPANY,
as GS Counterparty

By: _____

Name: SUSAN RUDOU

Title: ATTORNEY-IN-FACT

EXHIBIT A
to Intercreditor Agreement

[FORM OF]
JOINDER AGREEMENT

    The undersigned, _____, a _____, hereby agrees to become party as a [Grantor] [Secured Hedge Counterparty] under the Amended and Restated Secured Hedging Agreement Intercreditor Agreement, dated as of November 16, 2007 (the "Intercreditor Agreement"), among Aleris Nevada Management, Inc., Aleris International, Inc., the other Grantors party thereto from time to time, Deutsche Bank AG New York Branch as Administrative Agent under the Credit Agreement (as defined therein) and as Collateral Agent and the Secured Hedge Counterparties party thereto from time to time as amended, supplemented, amended and restated or otherwise modified and in effect from time to time, for all purposes thereof on the terms set forth therein, and to be bound by the terms of the Intercreditor Agreement as fully as if the undersigned had executed and delivered the Intercreditor Agreement as of the date thereof.

    [The Company, the Parent and the undersigned hereby notify the Collateral Agent that (x) the [SPECIFY SECURED TERM HEDGING AGREEMENT] (i) constitutes a "Secured Hedging Agreement" for purposes of the Credit Agreement and the other Credit Documents, (ii) does not constitute a "Secured Hedging Agreement" for purposes of the ABL Credit Agreement, the ABL Security Documents or any guaranties relating to the ABL Credit Agreement (as defined in the Credit Agreement) and (iii) in the case of the Parent, has been entered into, and the obligations of the Parent and the Company thereunder incurred, in compliance with the Credit Agreement and (y) the Expected Exposure with respect to such Secured Term Hedging Agreement for purposes of Section 5.1(i)(x) of the Intercreditor Agreement is $[_____].]

    The provisions of Article 6 of the Intercreditor Agreement will apply with like effect to this Joinder.

    IN WITNESS WHEREOF, the parties hereto have caused this Joinder Agreement to be executed by their respective officers or representatives as of _____, 20____.

[_____]

By:_____
    Name: _____
    Title: _____

Acknowledged and Agreed:

ALERIS NEVADA MANAGEMENT, INC.

By:_____

[[2719521]]

Name: _____
Title: _____

ALERIS INTERNATIONAL, INC.


By:_____
Name: _____
Title: _____